■ The People of the State of New York, Respondent, v Walter Rosado, Appellant. [666 NYS2d 227] —Cardona, P. J. Appeal from a judgment of the County Court of Ulster County (Bruhn, J.), rendered March 21, 1996, upon a verdict convicting defendant of the crimes of murder in the second degree (three counts), burglary in the first degree (two counts), robbery in the first degree (two counts) and hindering prosecution in the first degree.

On November 14, 1994, William Nestman and his neighbor, Douglas Pfleger, were found shot to death in their homes on a rural road in the Town of Plattekill, Ulster County. Each man was shot once in the head. The investigation immediately focused upon Robert Nestman (hereinafter Nestman), William's son, who, when questioned, named defendant as the shooter. Defendant was apprehended and made statements to the police admitting his involvement in the homicides; however, he accused Nestman of carrying out the execution-style slayings. Nestman pleaded guilty to two counts of murder in the second degree and was sentenced to two concurrent terms of 20 years to life in prison.

Defendant waived immunity and testified before the Grand Jury. He was subsequently charged in a nine-count indictment with four counts of murder in the second degree, two counts of burglary in the first degree, two counts of robbery in the first degree and one count of hindering prosecution in the first degree. Following a pretrial hearing, County Court suppressed defendant's statements based on the failure of the police to administer his *Miranda* warnings. At his jury trial, the People contended that defendant acted in concert with Nestman. Defendant took the stand and contended that he acted under duress. The jury acquitted defendant of the murder of William Nestman but convicted him of all remaining counts. He was sentenced to three indeterminate terms of imprisonment of 20 years to life on the three murder counts, four indeterminate terms of 8⅓ to 25 years on the two burglary and two robbery

counts, and 2⅓ to 7 years on the hindering prosecution count. The court directed the sentences to be served concurrently. Defendant appeals.

Defendant contends that the People's proof fell short of proving beyond a reasonable doubt that he acted in concert with Nestman to commit the charged crimes. "Penal Law § 20.00 imposes accessorial liability on an accomplice * * * for intentionally aiding another to engage in *conduct* which constitutes the charged offense while himself 'acting with the mental culpability required for the commission' of that offense" (*People v Flayhart*, 72 NY2d 737, 741 [emphasis in original]; *see, People v Kaplan*, 76 NY2d 140, 144-145; *People v Motter*, 235 AD2d 582, *lv denied* 89 NY2d 1038). Therefore, in order for defendant to be guilty as an accomplice to the crimes of murder, burglary and robbery as set forth in counts 1 through 8 of the indictment, it was incumbent on the People to establish beyond a reasonable doubt that he shared with Nestman the requisite intent for the commission of those crimes and engaged in deliberate conduct to bring them about (*see, People v Motter, supra*).

Before reviewing the evidence presented, we note that the standard of appellate review for determining the legal sufficiency of both direct and circumstantial evidence is the same: "whether the evidence, viewed in the light most favorable to the People, could lead a rational trier of fact to conclude that the elements of the crime[s] had been proven beyond a reasonable doubt" (*People v Rossey*, 89 NY2d 970, 971; *see, People v Cabey*, 85 NY2d 417, 420). With these principles in mind, we now review the evidence at trial.

On the evening of November 13, 1994, defendant and Nestman traveled from New York City to Ulster County by bus with $20 in cash between them. Nestman carried a fully loaded, Savage .308-caliber deer hunting rifle in a black case which had been reported stolen from Pfleger's residence on November 12, 1994. According to defendant, Nestman was taking him along on an overnight hunting trip. Nestman told defendant they would be staying at a gun lodge. Although defendant had never been hunting before and did not own a gun, he decided to go along to enjoy the scenery and wildlife. They did not sit together on the bus except for the last few minutes. Following their arrival at the bus station in the City of Newburgh, Orange County, Nestman and defendant took a taxicab to the vicinity of the residence of Nestman's father in Plattekill. Nestman paid the $20 fare. Defendant testified that this was the first time he heard about Nestman's father and not going to the gun lodge. After being admitted to his father's house, Nestman shot

and killed him. Both men then entered Pfleger's unoccupied home. Pfleger returned during the commission of the burglary and was also shot and killed by Nestman. Nestman and defendant gathered up various items of property and fled in Pfleger's vehicle back to New York City. Arriving early in the morning, defendant helped Nestman carry the stolen property up to defendant's apartment where it was stored. Later that day, Nestman returned to claim the VCR and television. The police eventually recovered the remaining items in a search of defendant's apartment.

Defendant testified that he never planned to commit any robberies, burglaries or killings and only cooperated with Nestman out of fear for his life when he saw Nestman shoot his father. However, defendant never mentioned that he was afraid of Nestman in his statement to the police. Furthermore, under cross-examination, he conceded that during all the events which transpired in Ulster County and the ride back to New York City, Nestman did not directly threaten him in any way and never pointed the gun at him or told him not to go to the police.

Even assuming that defendant initially did not share Nestman's intent when Nestman shot his father, an inference which the jury obviously drew when it acquitted defendant of responsibility for that crime, once Nestman's intent became clear defendant's actions "provided evidence of a common purpose * * * [and] evinced a consciousness of guilt" (*People v Cabey*, 85 NY2d 417, 422, *supra*). More specifically, defendant testified that after Nestman shot his father, he told defendant to watch his father and "tell [him] if he moves so I can put another one in him". Nestman removed a set of keys to Pfleger's house from a pile of his father's clothes and remarked, "Good, I got it. Let's go over to the neighbor's house." Defendant admitted that he helped Nestman gain entry to Pfleger's house by opening the outer screen door and that he "kind of like helped him rob the house". After the Pfleger shooting, defendant told how he and Nestman donned rubber gloves provided by Nestman because "he [Nestman] didn't want to leave prints around the house".

Notably, defendant never attempted to get away from Nestman, despite several opportunities, particularly when he was left alone in Pfleger's truck while Nestman disposed of the murder weapon in a nearby lake. After Nestman left defendant following their return to New York City, defendant went to his mother's house. He did not tell her what happened and did not call the police. It is clear that defendant's testimony raised a

factual issue in reference to his intent and the jury acted within its prerogative in resolving that question against him (*see, People v Cabey, supra,* at 421; *People v Mariani,* 203 AD2d 717, 718, *lv denied* 84 NY2d 869).

Based upon all the evidence adduced, we conclude that it provided a valid line of reasoning together with permissible inferences from which a rational trier of fact could find that defendant was an accomplice and that all the elements of the crimes charged were proven beyond a reasonable doubt (*see, People v Cabey, supra; People v Bleakley,* 69 NY2d 490, 495; *People v Contes,* 60 NY2d 620, 621).

We also reject defendant's contention that the jury's verdict was against the weight of the evidence. Defendant's claim that his testimony was entirely credible and established a defense of duress is belied by the absence of physical and verbal threats from Nestman, his initial statements to the police denying that he had seen Nestman or had ever been to Ulster County, and by several inconsistencies, the most glaring of which was his description of the events occurring at William Nestman's house. He testified that after they entered the house they sat in the living room facing Nestman's father when an argument erupted between Nestman and his father. During the argument, according to defendant, Nestman removed the rifle from the case, raised it to his shoulder and looked through the scope in the direction of a window. Defendant testified that as Nestman was lowering the rifle to his lap the gun went off killing Nestman's father, suggesting an accidental firing. However, medical evidence contradicted this scenario. The People's forensic pathologist established that Nestman's father sustained a broken jaw and broken dental plate—before he was shot—caused by a severe blunt force impact with a hard object. Furthermore, based on the forensic medical evidence and the entrance wound's location in the back of the father's head, the forensic pathologist concluded that he was seated on the couch leaning forward with his head over his thigh looking downward at the time he was shot.

Additionally, defendant's credibility was further questioned when he denied carrying a black gym bag containing a search light into the cab despite contrary testimony from a woman passenger and the cab driver. We also note that defendant testified that once inside Pfleger's residence, it took Nestman an hour to gather up the property and that all during that time defendant sat in the living room. Yet, in his statement to the police, defendant stated that "*we* wandered around the house for an hour or so looking around, then the owner of the

house we were in came home" (emphasis supplied). Clearly, the jury, as trier of fact, had an ample basis to reject defendant's affirmative defense of duress. Upon the exercise of our factual review power, we are satisfied that the findings of guilt were not against the weight of the evidence (*see*, CPL 470.15 [5]; *People v Bleakley*, 69 NY2d 490, 495, *supra*; *People v Mariani*, 203 AD2d 717, 719, *supra*).

Defendant also contends that he was deprived of his right to a fair trial by, *inter alia*, County Court's ruling which permitted the prosecution to inquire into the underlying facts of a 1993 robbery for which he was adjudicated a youthful offender. Ordinarily, evidence of a defendant's commission of other crimes is inadmissible if offered to establish a criminal disposition or propensity to commit the crimes charged (*see*, Prince, Richardson on Evidence § 4-501, at 175 [Farrell 11th ed]). By arguing duress, however, defendant placed his intent squarely in issue. It was, therefore, proper for the People to introduce the underlying facts of the youthful offender adjudication to prove a disposition to commit acts of a similar nature in order to rebut the implicit denial of criminal intent raised by this defense (*see*, *People v Calvano*, 30 NY2d 199, 205).

Finally, we reject defendant's contention that his sentence was excessive. "Sentencing lies within the sound discretion of the trial court and, absent an abuse of that discretion or extraordinary circumstances, this Court will not disturb the sentence" (*People v Motter*, 235 AD2d 582, 589, *supra*). Given the heinous nature of the crimes, defendant's previous involvement with the law, and noting that the sentence was less than that which is permitted (*see*, Penal Law §§ 125.25, 60.05 [2]; § 70.00 [3] [a] [i]), we find it well within County Court's discretion (*see*, *People v Motter*, *supra*).

We have examined defendant's remaining contentions and find that they are either unpreserved for review or lacking in merit.

White, Casey, Spain and Carpinello, JJ., concur. Ordered that the judgment is affirmed.